# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 30, 2023

Lyle W. Cayce
Clerk

No. 22-20362

ZELMA M. LOEB-DEFEVER; LOEB ARCHITECTS, L.L.C.,

*Plaintiffs—Appellants*,

*versus*

MAKO, L.L.C., *doing business as* PADUA REALTY COMPANY; FRANCISCO PADUA; ALEJANDRO PADUA; ANTONIO PADUA; WOODHAVEN INMOBILIA, LIMITED; BRATTEN INMOBILIA, LIMITED; INMOBILIA 2000, L.L.C.; PADUA INVESTMENTS, LIMITED; LUISFINA CORPORATION; TEXAS SENIOR LIVING OPERATOR, L.L.C.; TEXAS SENIOR LIVING MANAGER, L.L.C.; TEXAS SENIOR LIVING GROUP, L.L.C.; COTTAGES AT WOODHAVEN VILLAGE, LIMITED; PROPERO CONROE, L.L.C.; PROPERO SENIORS HOUSING FUND, L.L.C.; CPF LIVING COMMUNITIES II - WOODHAVEN, L.L.C.; CPF LIVING COMMUNITIES II ACQUISITIONS, L.L.C.; GRACE MANAGEMENT, INCORPORATED,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-1981

No. 22-20362

Before Jones, Clement, and Haynes, *Circuit Judges*.

Per Curiam:[*]

This is a copyright infringement case brought by Zelma M. Loeb-Defever and her architectural firm, Loeb Architects, L.L.C. (collectively, "Plaintiffs"), against Mako, L.L.C. d/b/a Padua Realty Company ("Padua Realty") and other various entities (collectively, "Defendants") involved in the development of a senior living facility. Years after learning that Padua Realty and Defendants allegedly used their copyrighted schematics to develop a senior living facility, Plaintiffs sued for copyright infringement, violations of the Digital Millennium Copyright Act ("DMCA"), and breach of contract.

Defendants and Padua Realty moved for summary judgment on the copyright infringement and DMCA claims. Padua Realty separately moved for summary judgment on the breach of contract claims. The district court granted both motions, and Plaintiffs timely appealed. For the reasons set forth below, we AFFIRM.

## I. Background

### A. Facts

In 2010, Padua Realty, a real estate development business owned and operated by Antonio Padua,[1] initiated a project to construct assisted living

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

[1] Antonio, together with his father, Francisco, and brother, Alejandro, have direct and/or indirect ownership interests in the following entities: Mako, L.L.C., Woodhaven Inmobilia, Ltd.; Bratten Inmobilia, Ltd.; Inmobilia 2000, L.L.C.; Padua Investments, Ltd.; Luisfina Corp.; Texas Senior Living Operator, L.L.C.; Texas Senior Living Manager, L.L.C.; Texas Senior Living Group, L.L.C.; and Cottages at Woodhaven Village, Ltd. Several of these entities were investors in the Project.

and memory care facilities, independent living facilities, and cottages in Woodhaven Village ("the Project"), located in Conroe, Texas. Padua Realty was referred to Loeb-Defever as a possible architect for the Project and requested a cost proposal from her for all architectural services. Although her initial proposal was rejected, Plaintiffs and Padua Realty subsequently entered into two limited-service contracts.

The contracts provided that Plaintiffs would complete the first two of seven phases of the Project. Under these phases, Plaintiffs agreed to provide Padua Realty "[o]ne set of schematic site plan, floor plan, and exterior front elevation, drawn, colored/rendered and ready for Client to reproduce, scan, and/or dry mount and laminate as desired." However, the contracts included an important limitation: the schematics could not be used "on other projects or extensions to [the Project] except by agreement in writing and with appropriate indemnification and compensation to" Plaintiffs. In return for their services, Plaintiffs would receive $10,800.

After Plaintiffs performed their contractual obligations, their relationship with Padua Realty faltered and another architect, Ted Trout & Associates, Ltd. ("Ted Trout"), was retained to complete the remaining phases of the Project. Although Ted Trout was provided Plaintiffs' preliminary design schematics as a "starting point" for further development, it allegedly redesigned and delivered a full set of architectural plans in late 2013.[2] It was around this time that Plaintiffs learned their schematics were allegedly being used in later stages of the Project. Shortly thereafter, Loeb-

---

[2] In the district court, the Defendants contended that Ted Trout essentially threw away the Plaintiffs' preliminary design schematics and started over from scratch. However, given that this was disputed, Defendants argued—for purposes of their summary judgment motion—that even if it were true that Ted Trout used Plaintiffs' schematics, the copyright infringement claim still failed due to the license.

Defever registered her designs with the United States Copyright Office as architectural works.

In 2015, several Defendants engaged in a series of sale/leaseback financing transactions in order to appropriately fund and manage the facilities. Thereafter, construction commenced, and once complete, Texas Senior Living Operator, LLC ("TSLO") began marketing the facilities by posting copies of Ted Trout's floor plans on its website. TSLO eventually sold the facilities to CPF Living Communities II-Woodhaven, LLC ("CPF"), who assigned Grace Management, Inc. as the day-to-day manager of the facilities and website. After this acquisition, CPF placed copies of Ted Trout's unit floor plans in brochures and posted them on the Woodhaven Village website.

## B. Procedural History

Nearly five years after they became aware that their schematics were allegedly being used in the Project, Plaintiffs sued Defendants and Padua Realty for copyright infringement under 17 U.S.C. § 501, violations of 17 U.S.C. § 1202(a) and (b), and breach of contract. For the copyright infringement claims, Plaintiffs alleged certain Defendants were liable for direct infringement because they used the schematics to create and subsequently market, rent, and sell the derivative works. Plaintiffs further alleged other Defendants and Padua Realty were contributorily or vicariously liable. As for the DMCA claims, Plaintiffs alleged certain Defendants were directly liable by removing "Loeb Architects, LLC" from infringing plans and either (1) including a different title block and copyright notice on the plans, and/or (2) distributing them through brochures and posting them on the Woodhaven Village website. Plaintiffs also alleged other Defendants and Padua Realty were secondarily liable under the DMCA because they induced or encouraged the alleged infringing conduct. Finally, Plaintiffs alleged that

Padua Realty breached the two contracts by failing to (1) consult with them before using the designs in advertisements; (2) inform them of all information known about the site that might have affected Plaintiffs' contractual performance; (3) acknowledge Plaintiffs' professional services in advertisements; and (4) furnish and coordinate the services of consultants "not included in the [contracts'] Scope of Services."

Defendants and Padua Realty moved for summary judgment on the copyright infringement and DMCA claims. They argued, as relevant here, that (1) the contracts granted them an express, nonexclusive license to use the preliminary design schematics in connection with the Project, including to make derivative works; (2) the DMCA does not apply to derivative works; and (3) Plaintiffs failed to show there was a genuine dispute of material fact regarding scienter for their DMCA claims. Padua Realty separately moved for summary judgment on the breach of contract claims. It argued that Plaintiffs failed to carry their burden of showing actual damages stemming from the purported breaches of contract. The district court granted both motions. Plaintiffs timely appealed.

## II.   Jurisdiction & Standard of Review

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction under 28 U.S.C. § 1291. "We review [the] district court's grant of summary judgment de novo, applying the same standard of review as . . . the district court." *Brand Servs., L.L.C. v. Irex Corp.*, 909 F.3d 151, 155–56 (5th Cir. 2018) (quotation omitted). "Summary judgment is proper only when it appears that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* at 156 (quotation omitted); *see also* FED. R. CIV. P. 56(c). We draw all inferences from the facts in the light most favorable to the non-moving party. *Id.*

"The existence of a license authorizing use of copyrighted material is an affirmative defense" to a copyright infringement claim, and therefore Defendants bear the burden of proving its existence. *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 884 (5th Cir. 1997). As such, to warrant entry of summary judgment, Defendants "must establish beyond peradventure all of the essential elements of the . . . defense." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (internal quotation marks and citation omitted). Only if Defendants succeed must Plaintiffs "designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and citation omitted). Nonetheless, conclusory evidence is insufficient to avoid summary judgment. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005).

## III.   Discussion

Plaintiffs raise three main issues on appeal. First, Plaintiffs contend the district court misinterpreted the scope of the license Plaintiffs granted to Defendants. Second, Plaintiffs assert Defendants were not entitled to summary judgment on the DMCA claims because there were genuine disputes of material fact regarding scienter. Third, Plaintiffs maintain Padua Realty was not entitled to summary judgment on the breach of contract claims because there were genuine disputes of material fact regarding damages. We examine each issue in turn, but none warrant reversal.

### A. The Scope of the Express, Nonexclusive License

It is undisputed that Plaintiffs granted Padua Realty an express, nonexclusive license to use the preliminary design schematics in connection with the Project.[3] What is disputed, however, is the scope of this license.

---

[3] Although Plaintiffs dispute the district court's holding regarding the implied license, we do not reach this issue because we affirm the district court on the ground that

No. 22-20362

Plaintiffs contend they only granted Padua Realty a limited license to use the preliminary design schematics to obtain financing for the Project. Padua Realty, on the other hand, contends that Plaintiffs' license allowed it, and the other Defendants, to use the preliminary design schematics to create derivative works—such as to develop construction plans and build facilities—as well as market, rent, and sell the facilities. Thus, the two main issues here are whether the license (1) included the right to create derivative works; and (2) allowed third parties to implement it.

A nonexclusive license can be express or implied and is generally construed under state contract law. *See Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 482–83 (5th Cir. Unit B Nov. 1981). This is not to say that federal law is inapplicable when construing a nonexclusive copyright license. *See id. at* 483 (explaining the "context of copyright law in which the agreement exists cannot be overlooked"). Rather, it simply acts as a gap filler when application of state law principles are preempted by the "[C]opyright [A]ct" or "violate federal copyright policy." *Id.* Neither conflict is present here and therefore, because the contracts contain a Texas choice of law provision, we apply Texas contract law.

A court's primary concern when construing a contract "is to ascertain the intentions of the parties as expressed in the document." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015). Our "analysis [begins] with the language of the contract because it is the best representation of what the parties mutually intended," and we give "words and phrases . . . their ordinary and generally accepted meaning." *Id.* We also "examine and consider the entire writing in an effort to harmonize and give effect to all

_____

Defendants conduct fell within the scope of the express license. Therefore, we express no judgment on the merits of the district court's holding for the implied license.

provisions of the contract so that none will be rendered meaningless." *Compliance Source, Inc. v. GreenPoint Mortg. Funding, Inc.*, 624 F.3d 252, 259 (5th Cir. 2010) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).

### 1.    Derivative Works

There are two relevant provisions in the contracts that Plaintiffs executed with Padua Realty.  The first provision explains that Plaintiffs agreed to provide Padua Realty with preliminary design schematics that Padua Realty could "*reproduce*, scan, and/or dry mount and laminate as desired."  The second provision explained that the "[d]rawings and specifications" were the property of Plaintiffs and prohibited their use "on other projects or extensions to this project" absent certain conditions. Reading these two provisions together, the district court concluded the contracts granted Padua Realty a nonexclusive license to use the schematics to create derivative works in connection with the Project so long as they were not used on "other projects or extensions to [the] project[s]." We agree with that construction.

The plain meaning of the verb "reproduce" in the first provision suggests the license granted Defendants the right to create derivative works. "[R]eproduce" is defined as "to imitate closely" or "to make a representation (such as an image or copy) of" something. *Reproduce*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/reproduce (last visited July 7, 2023).  Derivative works, by definition, are substantially similar to the copyrighted work. *See Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 267 (5th Cir. 1988) (noting that to constitute a derivative work, the infringing work must, in part, "be substantially similar to the copyrighted work").  Therefore, the right to "reproduce" a work appears to encompass the right to create a derivative work.  The verbs following "reproduce"—

"scan," "dry mount," and "laminate"—and the broad qualifier at the end of the provision, "as desired," further support this interpretation. Cumulatively, these provisions suggest Padua Realty had largely unfettered discretion to distribute and use the schematics throughout the Project's development.

The second provision reinforces this point. The phrase, "[t]hese documents may not be used on other projects or extensions to this project," limits the scope of the first provision. S*ee Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (explaining that in interpreting contracts, contracts must be read to give effect to all the provisions). However, this phrase also implies that Defendants were permitted to use the preliminary design schematics in subsequent phases. *See Universal Health Servs., Inc., v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 748 (Tex. 2003). The parties clearly contemplated this use because otherwise, Padua Realty would have entered into contracts that effectively prevented it from completing the Project and paid $10,800 for useless schematics. *See Absurdity Doctrine*, BLACK'S LAW DICTIONARY (11th ed. 2019). Accordingly, we conclude that the contracts granted Padua Realty a license to use the schematics in connection with the Project, including to create derivative works.

We briefly address a few of Plaintiffs' counterarguments.[4] First, contrary to Plaintiffs' contention, construing the verb "reproduce"

---

[4] Plaintiffs raise a number of arguments on appeal, but we conclude that none change the outcome. For instance, Plaintiffs contend the word "project" in the contracts only referred to their architectural services. Therefore, according to Plaintiffs, the second provision limited use of the schematics to phases one and two of the Project. This is a stilted interpretation of the word "project," particularly so because the contract expressly defines the term as "a freestanding, single story wood framed Assisted Living and Memory Care facility" with "60 assisted living units plus 24 memory care units." Plaintiffs' remaining arguments—such as their reliance on out-of-circuit precedent, their cramped

according to its plain meaning would not conflict with copyright policy. *See Womack & Hampton Architects, L.L.C. v. Metric Holdings Ltd. P'ship*, 102 F. App'x 374, 378 (5th Cir. 2004) (per curiam) (applying Texas's contract law principle that words in a contract should be given their plain meaning to a copyright license).

Second, the contracts' title—"Proposed Scope of Limited Services for Financing Package"—does not imply that the schematics could only be used in financing packages to solicit investors. Rather, the title and the two relevant provisions, when considered together, establish that the parties intended the schematics to be used both for financing purposes *and* as a conceptual springboard for later design stages. If they did not intend the latter usage, the parties' inclusion of the schematics in the financing package would amount to an affirmative misrepresentation. *See Harmonious Reading Canon*, Black's Law Dictionary (11th ed. 2019). Accordingly, such a construction is unreasonable.

### 2. *Third Party Implementation*

Plaintiffs maintain Padua Realty could not assign the contracts to Defendants because the contracts contained an anti-assignment clause. They further contend that under Texas law, the provision of architectural services are non-assignable personal services. Defendants do not dispute these conclusions, but instead contend any prohibition on assignments is irrelevant because Plaintiffs' license granted Padua Realty the right to work with third parties to effectuate the Project. We agree with Defendants.

Again, under Texas contract law, we begin with the text of the express, nonexclusive license. *See Compliance Source, Inc. v. GreenPoint Mortg.*

---

interpretation of the word "extensions," and the superfluous canon—also fail to establish that the license did not extend to derivative works.

*Funding, Inc.*, 624 F.3d 252, 259–60 (5th Cir. 2010).  The contracts expressly stated Padua Realty would provide, among other things, "[c]ivil [e]ngineering," "third party inspections," "[c]onstruction [t]esting services," and also "*furnish* and coordinate services of . . . [c]onsultants." These provisions demonstrate Padua Realty was expressly authorized to use third parties to implement the license.  *See also Seaview Hosp., Inc. v. Medicenters of Am., Inc.*, 570 S.W.2d 35, 39–40 (Tex. App.—Corpus Christi 1978, no writ) (concluding the word "furnish" requires a person to provide what is needed to perform the function while the word "perform" requires the person to actually carry out the function).  This authorization also included the right to market, rent, and sell the facilities, which was the very purpose for which they were built.  *See Kourosh Hemyari v. Stephens*, 355 S.W.3d 623, 626 (Tex. 2011) (explaining courts avoid construing a contract in a manner that would lead to absurd results).  Thus, Defendants' use of the preliminary design schematics to create derivative works and subsequent marketing, rental, and sale of the facilities did not exceed the scope of the license.

## B. DMCA Claims

Plaintiffs also contend the district court erred in granting summary judgment on the DMCA claims.  We find no error.  Plaintiffs failed to establish a genuine dispute of material fact on scienter.[5]

The DMCA prohibits distribution of false copyright management information as well as the unauthorized removal of copyright management

---

[5] The district court also concluded that the DMCA does not apply to derivative works.  Because we affirm the district court's alternative holding on scienter, we do not reach the issue relating to derivative works and express no judgment on the merits of that holding.

information.  *See* 17 U.S.C. § 1202(a), (b).  To recover under these provisions, Plaintiffs must show that Defendants engaged in the prohibited conduct with the intent or knowledge that such conduct would, "induce, enable, facilitate, or conceal an infringement."  *See id.*  Defendants could not have intended or even known that their conduct would "induce, enable, facilitate, or conceal an infringement" when they were not infringing Plaintiffs' copyright in the first place because they held a license.  As such, Defendants—including those alleged to be directly and vicariously liable— were entitled to summary judgment on Plaintiffs' DMCA claims as well.

### C. Breach of Contract Claims

Finally, Plaintiffs contend the district court erred in granting summary on the breach of contract claims.  We conclude that it was not erroneous. Neither Plaintiffs' evidence of copyright infringement damages nor the alleged judicial admissions purportedly ignored by the district court created a genuine dispute of material fact regarding damages.

Plaintiffs' theory of damages for copyright infringement—the profits they would have earned had they completed phases three through seven of the contracts—did not align with their theory of damages for their breach of contract claim because Padua Realty had no contractual obligation to retain Plaintiffs beyond the first two phases.  So, one could not support the other.

Likewise, Defendants' statement in the pretrial order that "the amount of any damages" was a contested issue of fact was not an unequivocal admission.  *Bank v. Redcom Lab'ys, Inc.*, 250 F.3d 319, 329 (5th Cir. 2001) (explaining to qualify as a judicial admission, the statement must be, among other things, "deliberate, clear, and unequivocal").  Rather, when it is read in context with their earlier statement that "Plaintiff[s] ha[ve] no actual damages and ha[ve] put forth no evidence of actual damages," it is clear Defendants were merely taking alternative litigation positions.  That does not

amount to a judicial admission. *See Helpert v. Walsh*, 759 F. App'x 199, 203–04 (5th Cir. 2018) (concluding a statement in a pretrial order that the party was at fault for the accident was not a judicial admission that the party was negligent because "[i]n that same order, [the party] expressly reserved as a contested issue of fact whether [the party] was negligent in causing the accident").

Therefore, Padua Realty was properly granted summary judgment for these claims as well.

## IV.    Conclusion

For the reasons discussed above, we AFFIRM the district court's grants of summary judgment.